# EXHIBIT D

# Litigation Finance

Home / Litigation Finance

"Equal justice under law is not merely a caption on the facade of the [US] Supreme Court building; it is perhaps the most inspiring ideal of our society. It is one of the ends for which our entire legal system exists . . . it is fundamental that justice should be the same, in substance and availability, without regard to economic status."

— Justice Lewis F. Powell, Jr., U.S. Supreme Court Justice, during his tenure as president of the American Bar Association (August 1976)

Equal justice under the law should not be a theoretical premise. But in modern times, civil lawsuits have become increasingly expensive, creating de facto barriers to the justice system. Claimants face the choice of going into debt to finance the litigation fees associated with bringing a lawsuit, such as the expense of attorney fees and expert witness fees, or walking away altogether as they are no match for their well-financed adversaries. The advent of the modern litigation funders and the industry provides a solution that places litigants on a level economic playing field and allows commercial disputes to proceed based on their merits.

## What is litigation finance?

Litigation finance … Litigation funding … Third-party Funding … Dispute finance … while there are many monikers for this industry, the premise behind the name is one and the same. Litigation finance provides capital to claimants, law firms, or companies collateralized solely by the future proceeds of their meritorious cases and legal claims. From a public policy standpoint, it provides a means to help make law firms and the legal system more accessible on a broader scale.

## Consumer vs. commercial litigation

**Two categories.**  There are two general categories for this type of niche litigation financing: "consumer" and "commercial". They differ in several ways.

**Consumer litigation financing.**  Consumer litigation financing primarily consists of non-recourse cash advances for personal injury plaintiffs and other individual consumer cases. The risk capital is typically repaid along with litigation fees if the plaintiff recovers anything from their legal claims. These arrangements usually involve individual claimants who have limited exposure to the legal system and who are rarely represented by counsel in the funding transaction. The dollar amounts involved in consumer transactions are much lower than in the commercial litigation finance realm; typical consumer funding amounts are between $2,000-$5,000.

**Commercial litigation financing.**   Commercial litigation finance generally consists of a non-recourse investment in virtually any type of large commercial disputes being brought by a company or individual, in return for a piece of the ultimate recovery, if any. Finance from litigation funders may also be used to support various types of legal claims, including but not limited to, contract disputes, commercial disputes, international arbitration matters, the monetization of trial awards on appeal, or the purchase of law firm receivables and judgment enforcement campaigns. These arrangements often involve sophisticated claimants who have had prior experience with litigation or arbitration, are represented by legal counsel, and require large commitments of lawsuit financing by the litigation finance firm (typically in the multi-million-dollar range).

**Single-case financing.**  Single-case litigation finance typically provides capital for legal finance and expenses to support a single case or arbitration. It can also include working capital, debt satisfaction and other items—all subject to recovery (if any) from the case. Single-case lawsuit financing can also include litigation financing for a defendant if the funder and claimant can agree on an appropriate, non-recourse return structure.

**Portfolio financing**. Portfolio litigation finance provides lawsuit financing for the legal finance to support multiple cases or arbitrations of a law firm or a company. In the case of a law firm portfolio, recovery of the funder's investment and return will come from the legal finance the firm collects from any one or more of the portfolio cases. In the case of a corporate portfolio, the funder typically will be paid from any eventual recoveries in the disputes, or according to other arrangements that the funder and company may agree in advance. Portfolio funding may also be used to fund defense-side cases, with recoveries coming from the plaintiff-side disputes.

**Multi-party financing.** Available in non-US jurisdictions, multi-party litigation funding (also known as lawsuit financing for group claims or class actions) typically involves the provision of finance for an action against a defendant on behalf of a group or a representative(s) for the group with the same or similar claims. A range of claims are suitable for funding, including securities/shareholder, environmental and product liability actions. Direct funding of multi-party actions is more common in jurisdictions such as Australia and certain European jurisdictions which have group or class action regimes but do not permit lawyers to charge a contingency fee.

## Benefits of litigation finance

**An alternative to loans**. Often, the capital obtained from a litigation funding firm is more attractive than taking out a bank's line of credit for lawsuit financing. An interest-bearing loan must be repaid no matter what happens in the case. If, for example, the case is lost at trial, the borrower is still obligated to pay back the loan, with interest.

That is not the case with litigation finance. Because funding is non-recourse, a return on investment is collected only if the case is successful. In addition to avoiding the debt obligation that exists with a traditional loan regardless of the outcome of the dispute, claimants who use litigation finance also are relieved of the burden of ongoing principal and interest payments. And a litigation funder's investment is collateralized by the lawsuit itself, which means in instances of law firm financing partners' personal assets are not on the line to return an investment should a recovery fail to materialize.

Litigation finance also is immune from rising interest rates. In the US, for example, traditional debt is typically tied to the Federal Reserve's benchmark interest rates and the cost of borrowing money could rise at any time. By comparison, the terms of a funding deal are set according to the size, strength, and collectability of the dispute being financed.

In addition to reducing risk, using litigation finance rather than self-funding legal disputes delivers immediate accounting benefits to companies and law firms. Loans add to operating expenses and thus, reduce profits. In contrast, dispute funding removes that expense and may, in some circumstances, even be treated as revenue, immediately boosting the financial picture for a company or law firm.

**Flexibility**. Many claimants are looking for a more sophisticated arrangement that allows them to take advantage of one of the key benefits of litigation finance: its flexibility. Because of its non-recourse nature, litigation finance can be used to pay legal fees and expenses associated with pursuing disputes and in some circumstances, may be used for any other reasonable purpose the funded party deems necessary. Litigation finance can, for instance, be deployed to defray operational expenses during a long, bet-the-company case, or to fund other contingency litigation (where permitted) that would be too costly to pursue without outside financing.

Litigation finance also allows lawyers, claimants, and companies the flexibility to withstand low-ball settlement offers on meritorious claims, thus enhancing the likelihood that the dispute will be resolved based on the strength of the legal claim, rather than based on the relative financial strength of the parties.

**Unlock value for companies**. Dispute finance has the added power to unlock new value for companies. Consider that a company using litigation financing can:
Hire lawyers that it might not otherwise be able to afford.

Remove a portion of a company's legal spending from the expense column, allowing for more flexibility in its defense efforts—and possible pursuit of meritorious plaintiff-side claims previously left on the cutting room floor. Also, this could release capital for other priorities and help improve the enterprise's margins.

Potentially turn a company's legal department into a revenue source instead of a fees and expenses centre.

# The "finance" in commercial litigation finance

**Non-Recourse**. Legal financing provides non-recourse funding. This means that if the claimant does not recover any proceeds from their case by way of settlement, judgement, award or otherwise, it is not obligated to repay the litigation finance firms(unless otherwise agreed in advance by the parties). Simply put, if the litigant loses, the litigation funding firm receives nothing, including its invested capital.

**Not a Loan**. Because commercial litigation finance is non-recourse, it is not a loan. There is no absolute obligation to repay the principal, there is no guaranteed return on investment and the only collateral securing the cash advance is the proceeds (if any) from the legal financing. For example, in the US, commercial litigation finance arrangements generally are exempt from state usury statutes. (See, for example, Lynx Strategies v. Ferreira, 28 Misc. 3d 1205(A), at *2 (Sup. Ct. N.Y. July 6, 2010) in which the court held that usury laws did not apply to the litigation funding firms because it did not advance a loan but took "an ownership interest in proceeds for a claim, contingent on the actual existence of any proceeds".)

**Typical Return Scenarios**.  Funding arrangements are bespoke. The litigation funders' contracted-for returns depend on a host of factors, including the strength of the case merits, the risk profile of the subject matter at issue, the share of risk capital to which the litigation funding firm is committing, collectability concerns and more.

**Sharing Risk.** Risk-sharing depends on a number of factors, including the claimants' ability to pay all or a portion of the legal fees and expenses and the willingness of the lawyers to enter into a hybrid (or full) contingency fee arrangement (in jurisdictions where permitted), or the lawyers accepting payment of only a proportion of their fees. Certain law firms that rely heavily on the billable hour model, for instance, are reluctant to take significant risk on plaintiff-side cases. With that said, some litigation finance firms are willing to forgo a risk-sharing exercise in certain circumstances—ie, by paying full hourly rates and all legal fees and expenses in exchange for a larger portion of the legal proceeds if the legal claim is successful.

# What to expect when seeking litigation finance

**Non-disclosure agreement**.  Litigation funders invariably commence the funding process by requiring the parties to execute a non-disclosure agreement (NDA) (also known as a confidentiality agreement). An NDA is the cornerstone for protecting confidentiality and permitting the free flow of information among the claimant, the lawyers and the funder. It permits the funder to comprehensively assess the merits of the dispute at issue.

**Initial case or portfolio analysis**.  After gathering initial information and documentation from the claimant and/or lawyers under the parties' NDA, the litigation funding firm typically conducts an initial analysis of the case, This analysis is primarily to determine whether the matter fits the litigation funder's financing criteria, when to accept

cases but also includes a high-level review of the case merits. The nature of the initial case analysis varies somewhat based on the funder as well as on the complexity of the matter, the size of the investment, and the parties' general understanding of how risk-sharing and other factors are likely to work.

**Term sheet**.  If the parties share a mutual interest in proceeding, the litigation funding firm may propose a term sheet outlining what the financial terms of the investment are likely to be if it funds the case.  Again, the nature of the term sheet (and its timing in the process) varies by the litigation financing firm and regional market. Some litigation funders offer term sheets that are non-binding except as to exclusivity during their due diligence period. Others may not require exclusivity but do mandate break-up fee provisions. There are likely many other permutations.

**Due diligence**.  All reputable funders conduct extensive diligence into the investment opportunity. This consists of a deep dive into the merits of the claims, potential damages, settlement and collection prospects, and the amount of capital needed to pursue the matter. It also involves an analysis of the claimant's background and financial position and the capabilities of the law firms and lawyers handling the case, including their track record of results in handling similar cases. Here too, the process differs somewhat between litigation funding firms, and regional practices around the world may differ as well. Some funders leverage in-house investment teams comprised of senior litigators or former litigators with significant experience from elite law firms to perform diligence. These litigation funders also frequently engage trusted outside diligence counsel and economic advisors to provide a second opinion about the likelihood of a favorable outcome. Other funders rely exclusively on outside counsel and other advisors to perform their due diligence.

**Funding decision and litigation finance agreement**. The diligence period varies so widely among litigation financing firms and is based on the nature of the investment that providing an estimated average time to an investment decision would not be reliable. It is safe to say that the process typically takes weeks, not days. Many litigation funders have an investment committee or other decision-making body that determines whether to invest based on a written and/or oral presentation by the team proposing the investment. The goal of the due diligence period is to drive toward the investment decision if the merits and other considerations support the recommendation. If they do not, the funder informs the claimant that it cannot recommend the investment to the decision-making body and frees the claimant to explore other options. During the diligence period, funders may also provide the litigation funding agreement (LFA) to the claimant and lawyers for vetting with the goal of hitting the ground running after the investment decision is secured. The LFA is a binding contract that sets out in detail the terms and conditions of the investment.

**Monitoring**.  The post-investment monitoring of matters also can vary somewhat among litigation finance firms, from investment to investment, and also depending on the jurisdictions involved. Typically, however, litigation funders take a "light touch" approach to case management. Litigation funders are not permitted to exercise control over the lawyers' strategy decisions and generally are afforded limited rights in this regard under the LFA. The right to be informed, including of settlement offers and major case developments, is a fairly common one. Thus, litigation funders usually check in on a regular basis with the lawyers and claimant and sometimes require periodic written reports of material developments.  Because litigation finance professionals are intimately familiar with the case merits, the lawyers and claimant often seek their non-binding input on strategy and other important issues as the case proceeds. This is especially true if the funding professionals are lawyers or former lawyers. Litigation funders may attend mediations and settlement conferences—not because they control settlement, but in some jurisdictions, they may advise the claimant about how the LFA operates under different settlement scenarios and to provide any pertinent information to the neutral or mediator. Funders also may attend major hearings and trial as observers, so long as their attendance does not raise confidentiality concerns for the claimant and lawyers who wish to keep their finances private (where permitted).

# The Global Evolution of Litigation Finance

Third-party lawsuit financing is not a new concept and dates back to medieval England when corrupt nobles used the legal system to their advantage by having their subjects act as proxies to litigate their own disputes or to enhance their wealth.[i]  In an effort to curb this misuse of the law, the doctrines of maintenance and champerty were enacted in England and spread to other common law jurisdictions to restrict third parties from aiding litigants. Maintenance refers to a third-party providing financial assistance to help maintain litigation. Champerty occurs when maintenance is taken a step further and the third-party seeks a return for its financial assistance, usually in the form of a portion of the recovery from the lawsuit.

As the corrupt acts for which these doctrines were enacted began to subside and maintenance and champerty were relegated to law school textbooks, it was not until these doctrines were abolished in various jurisdictions around the world that the road to accessible justice would begin to be paved.

<u>Australia</u>

The seed of the modern litigation finance market was planted in Australia, where a confluence of factors fostered its growth.

Since 1995, insolvency practitioners have been permitted to use their statutory power of sale to sell the fruits of a legal claim where the claim can properly be characterized as 'company property'. This enabled administrators, liquidators, and bankruptcy trustees to enter into contracts to finance litigation designated as company property, thereby recognizing a company's legal claims as a corporate asset. Subsequently, third party litigation funding materialized to help insolvent entities finance the legal costs associated with pursuing their claims in exchange for a portion of the proceeds.

At this point in time, litigation finance was expressly permitted in the insolvency arena only. Any litigation finance firms outside the insolvency context ran the risk that their finance agreements would be deemed against public policy and thus, rendered illegal and void.

Yet, the pressure to allow litigation finance firms in other proceedings, such as class actions, grew. Given Australia's prohibition against contingency fee arrangements, coupled with the "loser pays" rule (where an unsuccessful party is required to pay the successful party's legal costs), it was extremely difficult for someone to accept the role as representative plaintiff in a costly class action due to the financial risks involved if the case was unsuccessful.

It was not until 2006 that a landmark ruling by the High Court of Australia (the highest court in Australia) paved the way for funding single and multi-party (class action) proceedings. In *Campbells Cash and Carry Pty Ltd v Fostif Pty Ltd* (2006) 229 CLR 386, the High Court found that sufficient safeguards were already in place to dispel abuse by a litigation finance firm and, further, that litigation finance firm was not contrary to public policy, but rather, in support of it as it promoted access to justice.

By the time the High Court gave litigation finance the green light in *Fostif*, the doctrines of maintenance and champerty as crimes and torts had been abolished in many Australian jurisdictions[ii]. As legal barriers to litigation finance fell in Australia, so began the birth of an industry that would spread across the globe.

Europe

**Common Law Jurisdictions – England and Wales**

In the United Kingdom, where the common law doctrines of maintenance and champerty were put in place primarily to curb unscrupulous practices by noblemen during medieval times, prohibitions to third-party funding would begin to thaw upon the abolition of the crimes and torts of maintenance and champerty as a result of the Criminal Law Act of 1967. However, the Act continued to provide that if a litigation finance firm agreement was found to be against public policy, it would be deemed illegal and therefore unenforceable.

Nevertheless, this opened the door for alternative fee arrangements. Prior to this, claimants would either personally fund the litigation expenses, use insurance, or seek help via legal aid. However, with the passage of new legislation via the Courts and Legal Services Act of 1990 (CLSA)[iii], claimants could alleviate the financial strain of bringing a claim by way of Conditional Fee Agreements (CFAs), also known as "no win no fee" agreements. Over a decade later in 2013, Damages Based Agreements (DBAs) were enacted as another alternate financial arrangement for claimants to gain access to justice.

Essentially, a CFA allows law firms or a legal representative to recover his or her legal fees and expenses plus an 'uplift' on their fees only if the case is successful. On the other hand, a DBA is a form of contingency fee agreement and allows a representative to recover an agreed percentage of any damages awarded to the claimant only if the case is successful. The Damages–Based Agreements Regulations 2013 define a representative as the person providing advocacy services, litigation services or management services to which the DBA relates[iv].

During this period, England and Wales actively sought avenues to make justice accessible for their citizens. However, it was not until the decision in *Arkin v Borchard Lines Ltd* [2005] EWCA 655 that spurred the rise of the litigation finance market. The decision in the *Arkin* case was notable for resulting in the so-called 'Arkin Cap', whereby the risk to litigation funders to pay the full amount of an adverse costs ruling (the other side's costs if the case was unsuccessful) was "capped" to the amount of funding that had been paid by the funder. As funders were able to assess their risk of financial loss more readily due to this cap, it helped foster the creation of litigation funders to meet litigation finance market demand.

However, the recent decision in *Davey v Money and others* [2019] EWHC 997 changed this reliance on the Arkin Cap. In *Davey*, the court found the Arkin Cap should instead be applied in a discretionary, rather than an absolute, manner, with a determination of liability for adverse costs between a funder and claimant to be left up to the court to apportion as appropriate. Despite this ruling, this development is unlikely to curb the litigation finance market as funders can utilize after-the-event (ATE) insurance to guard against litigation risk.

As reception to alternative fee agreements and litigation finance industry became accepted in England and Wales and litigation finance firms proliferated the market, questions surrounding regulation of the industry came into play. In 2009, Lord Justice Rupert Jackson spearheaded a government review of legal financing, including a review of third-party litigation funding. His final report, released in 2010 lead to significant amendments to the costs procedures in England and Wales, known as the Jackson Reforms. Lord Justice Jackson supported the concept of funding and recommended a voluntary code of conduct to oversee litigation finance activity in the country. The Association of Litigation Funders (ALF) of England and Wales, a self-regulated body, was later established in 2011.

**Civil Law Jurisdictions**

European countries operating under civil law systems and civil lawsuits were not faced with barriers to the use of litigation finance as the common law doctrines of maintenance and champerty did not exist within these jurisdictions.

Germany

Litigation finance commenced in Germany in 1999 and provided claimants, who otherwise would not have the means for legal financing, with an avenue to justice. Funding helped to fill a gap between credit facilities provided by banks (which are typically denied unless appropriate securities are provided by the claimant) on one side and the prohibition against lawyers to work on a contingency fee arrangement on the other. Because commercial litigation funders can finance a claimant without requiring the provision of securities, and because they are not considered legal services providers, it became possible for funders to finance litigation on a non-recourse funding basis in return for a share of the proceeds.

Litigation finance is not regulated in Germany and there are no restrictions on entry into the commercial litigation finance market. Funding agreements in Germany are governed by contract law and therefore the terms must be fair.

Litigation funding itself has never been legally challenged in Germany. In fact, a small number of court decisions have confirmed the legal structure of litigation funder agreements as a claimant-funder partnership organized under the laws of the German Civil Code. In addition, the Higher Regional Court of Cologne recently confirmed that law firms and lawyers should advise their clients about litigation finance (Az.: 5 U 33/18 [11 November 2018]).

Following recent publicity about consumer claims funded in Germany, there has been an increasing awareness and acceptance of the commercial litigation finance industry. As a result, the litigation finance market continues to grow in Germany.

Netherlands

The Netherlands has not had any restrictions on litigation finance, nor did it place restrictions on the amount of control funders could assume. As the common law doctrines of maintenance and champerty were never introduced into the Dutch Civil Code, funding agreements are governed by contract law and are in principle binding unless the agreement violates public policy[v] or the principles of reasonableness and fairness.

Litigation finance in the Netherlands is presently used predominantly for large multi-party claims, including shareholder claims, cartel claims, and more recently for GDPR/data breach claims. It is also used for funding the enforcement and recovery of high value unpaid claims, often originating from exports to emerging markets and cross border arbitrations.

### Switzerland

In Switzerland, litigation finance is permitted provided funders act independently of a claimant's attorney (BGE 131 I 223/2004). In a nod to its widespread acceptance, the court also found that it is a lawyer's duty to inform their clients about their funding options (Supreme Court decision 2C_814/2014). Particular benefits for Swiss litigants include the funding of money that plaintiffs are required to deposit with the court for anticipated litigation expenses at the outset of litigation (under the Swiss Code of Civil Procedure of 2011).

### Other civil law jurisdictions

Germany, the Netherlands, and Switzerland are not the only civil law jurisdictions that allow litigation funding. Dispute finance is gaining in use and popularity in several jurisdictions, including Italy, France, and Spain.

United States

The American legal system stands on a body of law that is a melting pot of common law principles, case law, statutes, ordinances, and regulations. Early acceptance and wide use of contingency fee arrangements coupled with the default of the "American rule" on attorneys' fees—whereby each party bears its own respective legal costs regardless of outcome—meant the development of the litigation finance market in the US trailed some common law jurisdictions around the globe.

However, as the legal fees and expenses associated with getting a lawsuit through trial became increasingly prohibitive for all but the largest corporations, the need for litigation finance and its benefits became more obvious to the American legal market, particularly in the years following the Great Recession. Out of the ashes of the 2008 fiscal crisis arose an industry that could deliver what claimants, law firms, and companies needed—better access to the American justice system. As the core of dispute financing is the provision of non-recourse funding, the industry could not have come into vogue at a better time in the United States.

Litigation funders were not met with open arms by any means. Large corporate defendants that once enjoyed the privilege of engaging in delay tactics to run out their adversaries' more limited legal budgets were not delighted to now be placed on equal footing. To combat this emerging industry, critics of litigation finance pointed to the archaic doctrines of maintenance and champerty to denounce the viability of its use. Supposed ethical concerns (quite similar to those raised for the past century around contingent legal fees and expenses) were raised. Yet courts were not dissuaded and slowly but surely, uneasiness over the legality of litigation finance started to wane as a body of modern case law gradually developed in favour of its use, noting the access-to-justice benefits it could provide. Indeed, Americans have long had a more egalitarian view of access to courts and law firms counsel than their English brethren. The right to counsel in criminal trials is enshrined in the Sixth Amendment to the US Constitution—the English did not adopt this right until almost 100 years later.

For example, in what has become a seminal decision for modern litigation finance, the federal district court in *Miller UK Ltd. v. Caterpillar, Inc.*, 17 F. Supp. 3d 711 (N.D. Ill. 2014) dismissed the notion that the use of litigation finance was prohibited by the Illinois maintenance and champerty statute, finding instead that the statute was penal in nature and must be strictly construed as such. As the funding agreement at issue in *Miller* was not what the legislature intended to prevent, the funding agreement was determined to be legal and binding.

Some states, like California, simply never adopted statutes prohibiting champerty and maintenance. (*See In re Cohen's Estate,* 66 Cal. App. 2d 450, 458 (1944).)  In the California decision of *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118 (1990) the court stated:

> "In fact we have no public policy against the funding of litigation by outsiders.  [...] Our legal system is based on the idea that it is better for citizens to resolve their differences in court than to resort to self-help or force. It is repugnant to this basic philosophy to make it a tort to induce potentially meritorious litigation."

And other states, like New York, recognized that while they technically held maintenance and champerty statutes in the books, the statutes should not act to prohibit the use of commercial litigation finance generally. (*See, e.g., Justinian Capital SPC v WestLB AG, N.Y. Branch,* 28 N.Y.3d 160, 167 [N.Y. 2016]). Put simply, "the champerty statute does not apply when the purpose of an assignment is the collection of a legitimate claim." (*Trust for the Certificate Holders of the Merrill Lynch Mortgage Investors, Inc. v Love Funding Corp.*, 13 NY3d 190, 200, 201 [2009]). The court in *Justinian* further recognized that "the ancient prohibition of champerty must be reconciled with modern financial transactions." (citing *Bluebird Partners, L.P. v First Fidelity Bank, N.A.*, 94 NY2d 726 [2000].) As the court in *Bluebird Partners*, 94 NY2d at 739, stated, "To say the least, a finding of champerty as a matter of law might engender uncertainties in the free market system in connection with untold numbers of sophisticated business transactions—a not insignificant potentiality in the State that harbors the financial capital of the world."

More recently, on June 3, 2020, the Minnesota Supreme Court in *Maslowski v. Prospect Funding Partners,* 944 N.W. 2d 235 (Sup. Ct. Minn. 2020) <u>abolished the common-law prohibition against champerty</u> altogether. In conducting a historical review of the centuries-old doctrine of champerty, the court concluded that the principle behind the champerty doctrine outlived its utility: "Our review of changes in the legal profession and in society convinces us that the ancient prohibition against champerty is no longer necessary."

Public policy concerns surrounding accessibility to the courts also helped boost approval of funding. In *Hamilton Capital VII, LLC, I v. Khorrami, LLP, et al.,* New York Supreme Court Justice Shirley Werner Kornreich observed that:

> "Providing law firms access to investment capital where the investors are effectively betting on the success of the law firm promotes the sound public policy of mak justice accessible to all regardless of wealth. Modern litigation is expensive, and deep pocketed wrongdoers can deter lawsuits from being filed if a plaintiff has no r financing her or his case."

The development of case law in favour of commercial litigation funding in the United States helped warm its embrace by claimants as an alternative fee solution that served to dissolve financial barriers to the courts. For law firms and companies looking to utilize this new resource, litigation finance has become an attractive choice to help improve cash flow, spread the risks of litigation, and offer flexible fee arrangements to new and current clients.

Canada

Similar to regimes with common law roots, Canada also prohibited maintenance and champerty. While Canada took steps to abolish these doctrines as crimes in 1953, they remained intact as torts in most provinces, though notably not in Quebec, which is a civil law jurisdiction. The torts prohibited the use of contingency fee arrangements until the groundbreaking case of *McIntyre Estate v. Ontario (Attorney General)*, 2002 CanLII 45046.

In *McIntyre Estate*, the Ontario Court of Appeal found a contingency fee arrangement was not per se champertous. The court reasoned that:

> "One way to make justice more accessible is to provide a flexible approach to the payment of legal services by permitting contingency fees. The common law regard contingency fee agreements has begun to evolve so as to conform to the widely accepted modern public policy norms recognizing the advantages in permitting cor fee agreements in some circumstances…."

While this decision relaxed strict adherence to maintenance and champerty provisions, it recognized that safeguards should remain in place to protect a claimant from unreasonable fee agreements. Subsequently, Ontario enacted a Contingency Fee Agreements regulation, which placed a 50% cap on lawyers' contingency fees, leaving room for lawyers to obtain a higher percentage only with leave of the court.

Litigation funders used the precedent of *McIntyre Estate* to argue that third parties should be allowed to fund litigation without running afoul of the torts of maintenance and champerty. Several decisions in the decade following *McIntyre Estate* culminated in *Houle v. St. Jude Medical Inc.*, 2017 ONSC 5129, which saw the Houles as representative plaintiffs in a proposed product liability class action. They were not in a financial position to fund the litigation costs of the class action, nor were they (or their lawyers) prepared to take on the risk of paying any adverse costs awards in the event the litigation should fail. In that context, the plaintiffs entered into a litigation finance agreement with Omni Bridgeway (f/k/a Bentham IMF), and sought approval of the agreement from the Ontario Superior Court.

In providing its conditional support of the litigation finance agreement, the Court recognized that:

> "The law in Ontario … has developed and evolved so that supporting another's litigation is not categorically illegal and, thus, contingency fees and third-party fundin litigation became a possibility. The policy change was the recognition that the financial assistance of a third-party funder might be the only means for a litigant to ac access to justice."

The Court also noted that the approval of a litigation finance agreement in a class action matter must be done on a case-by-case basis and the general test for determining whether a third-party agreement was champertous was whether it was a "fair and reasonable agreement that facilitates access to justice while protecting the interests of the defendants." Other factors to be considered include whether a funding agreement compromises the principles of independence of counsel and whether the confidentiality agreements between the parties are observed and remain intact[vi].

With litigation finance being allowed in class actions, the demand for funding in single-party commercial cases would soon follow as claimants sought help to alleviate the high costs and risk associated with bringing suit. Decisions surrounding the use of dispute funding in these types of cases by the Federal Court of Canada and the Ontario Superior Court have determined that litigation financing is not unlawful per se, that the litigation privilege attaches to certain aspects of funding such agreements (*Seedlings Life Sciences Ventures LLC v. Pfizer Canada Inc.*, unreported Order of July 17, 2017, Court File No. T-608-17), and that while funding arrangements require approval in the context of class actions, outside class actions no such approval is required for simple commercial dispute cases (*Seedlings Life Sciences Ventures LLC v. Pfizer Canada Inc.*, 2017 FC 826; see also *Schenk v. Valeant*, 2015 ONSC 3215).

More recently, in a positive sign forward for the litigation finance market, the Supreme Court of Canada in *9354-9186 Québec Inc. v. Callidus Capital Corp.*, 2020 SCC 10 (commonly referred to as Bluberi) affirmed the decision by an insolvency court to approve a litigation finance agreement by Omni Bridgeway (f/k/a Bentham IMF) as a form of interim financing to an insolvent debtor company. In so doing, the Court recognized that litigation can be a "pot of gold" from which funding can help claimants retrieve value. With this stamp of approval from Canada's highest court, cash-starved litigants looking to secure their rights in court will have an easier time turning to litigation funders for help in lawsuit finances.

\* For an overview of the early treatment of maintenance and champerty as they pertain to third-party funding agreements in Canada, click here. And for a compilation of relevant Canadian decisions surrounding litigation finance, including recent case law, click here.

International Arbitration

With the rising use of litigation funding in multiple countries around the world, it would come as no surprise that the international arbitration community would soon follow. The use of litigation finance in international dispute resolution has grown in many jurisdictions, including England, the US, continental Europe, Singapore and Hong Kong.

In August 2014, the International Council for Commercial Arbitration (ICCA) and Queen Mary, University of London established a joint taskforce on litigation funding that aimed to create consistent rules and procedures relating to funding of international dispute resolution. In April 2018, the ICCA-Queen Mary taskforce released its final report during the ICCA Congress in Sydney. The report dealt with the principal issues that arise in the context of litigation finance, including disclosure, conflicts of interest, costs and security for costs and provided detailed commentary on each area.

In October 2014, the International Bar Association guidelines on conflicts of interest were revised and included provision to the effect that litigation funders and insurers were effectively equivalent to a party to an arbitration.

To remain competitive against other jurisdictions that allowed litigation finance, Singapore and Hong Kong—both key hubs in Asia for arbitral claims—adopted legislation in recent years to facilitate the use of dispute funding also called litigation funding.

In early 2017, Singapore passed legislation that abolished the torts of maintenance and champerty which had previously acted as a barrier to the funding of commercial litigation and expressly endorsed litigation finance of international arbitration seated in Singapore[vii].  For a funding agreement to be enforceable, the litigation funders must be a 'qualifying third-party funder' and comply with any prescribed regulations[viii]. Under the prescribed regulations, the funding of international arbitration proceedings is permitted, as well as any connected court and mediation proceedings (including enforcement proceedings)[ix]. The litigation funders must also meet certain capital adequacy requirements.

Following recommendations made by the Law Reform Commission in 2016, Hong Kong enacted similar legislation to Singapore in 2017 in relation to the funding of arbitration and related proceedings[x]. However, the crimes and torts of maintenance and champerty were not abolished in Hong Kong. The legislation came into force in February 2019 when a Code of Practice was issued. The Code of Practice provides guidance to in relation to arbitrations seated in Hong Kong and services provided in Hong Kong on arbitrations seated elsewhere.

Omni Bridgeway was one of the first litigation funders to finance international arbitration matters in both Singapore and Hong Kong under the new legislation in each jurisdiction.

Many courts and tribunals around the world have acknowledged that the common law doctrines of maintenance and champerty are antiquated and no longer relevant in today's modern society. As access to justice is becoming increasingly cost-prohibitive, courts recognize the need for litigation finance as a means to alleviate the high fees and expenses as well as risks associated with bringing legal claims. By relieving these financial pressures, equal justice under the law can be achieved, as legal disputes will truly be decided on the merits.

---

i "Litigation Funders: Champions or Champertous?" *Omni Bridgeway,* 01 December 2017, https://omnibridgeway.com/insights/blog/blog-posts/global/2017/11/30/litigation-funding-champions-or-champerty
ii For example, the Maintenance, Champerty and Barratry Abolition Act 1993 (NSW) sections 3, 4.
iii The CSLA was later amended by the Access to Justice Act 1999 and the Legal Aid and Sentencing and Punishment of Offenders Act 2012.
iv Andrew Evans & Nicholas Thompsell, "*Funding Litigation – the good, the bad and the ugly.*" 28/07/2016. https://www.fieldfisher.com/en/insights/funding-litigation-the-good-the-bad-and-the-ugly
v Reinout Philips, "*The Third Party Litigation Funding Law Review - Edition 3: NETHERLANDS.*" December 2019. https://thelawreviews.co.uk/edition/the-third-party-litigation-funding-law-review-edition-3/1212057/netherlands
vi Hugh A Meighen, *The Third Party Litigation Funding Law Review - Edition 2*, Canada, December 2018.
vii Civil Law (Amendment) Act 2017 (CLAA 2017) and Civil Law Act (Cap 43), sections 5A and 5B and associated regulations.
viii Civil Law (Third-Party Funding) Regulations 2017.
ix *Ibid*, section 3.
x Arbitration and Mediation Legislation (Third Party Funding) (Amendment) Ordinance 2017.

© OmniBridgeway, 2024

All Rights Reserved

Follow Us

[in]

[twitter]